Richard L. McINTOSH, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 91–2162.

United States Court of Veterans Appeals.

April 16, 1993.

Hugh P. Finerty, Jr. and Frances M. Bertsch, Council Bluffs, IA, were on the brief, for appellant.

James A. Endicott, Jr., Gen. Counsel, David T. Landers, Acting Asst. Gen. Counsel, Pamela L. Wood, Deputy Asst. Gen. Counsel, and William S. Mailander, Washington, DC, were on the pleadings, for appellee.

Before KRAMER, FARLEY and IVERS, Associate Judges.

IVERS, Associate Judge:

Richard L. McIntosh appeals from a November 1, 1991, decision of the Board of Veterans' Appeals (BVA or Board) which declined to reopen his previously disallowed claim for service connection for a right knee disability on the grounds that evidence submitted by the veteran did not constitute "new and material" evidence. 38 U.S.C.A. § 5108 (West 1991). The Court has jurisdiction of the case under 38 U.S.C.A. § 7252(a) (West 1991). The Secretary of Veterans Affairs (Secretary) has filed a motion for summary affirmance. The Court holds that the BVA determination that the evidence submitted by appellant was not new and material was correct. Accordingly, for the reasons set forth in this opinion, we affirm the decision of the BVA.

## FACTS

The veteran served in the United States Navy from December 1950 to March 1951, at which time he was discharged for a medically disqualifying disability which "exist[ed] prior to entry on active duty and [was] not aggravated by mil[itary] s[ervice]." R. at 1–2. In 1954, the veteran was diagnosed with osteochondromatosis of the right knee upon admission to a Veterans' Administration (now Department of Veterans Affairs) (VA) hospital, and surgery was performed on his knee. R. at 5–6. Osteochondromatosis is defined as "multiple hereditary exostosis" which in turn is defined as "the presence of multiple exostoses in the long bones of children due to a hereditary defect of ossification in cartilage, resulting in severe skeletal deformity and stunting of growth." MELLONI'S ILLUSTRATED MEDICAL DICTIONARY 157, 351 (2d ed. 1985) [hereinafter "MELLONI'S"]. The veteran's original claim for service connection for a right knee injury was denied by a Regional Office (RO) rating board in October 1954; the rating board noted that the veteran had injured his knee playing football in 1949 and that no aggravation of the injury was shown to have occurred during service "other than the expected residual of previous injury." R. at 7.

In January 1955, pursuant to having been selected by a local board of the Selective Service System, i.e., the draft board,

the veteran was given a preinduction physical for induction into the United States Army at an Armed Forces Examining Station (AFES). R. at 9, 12, 105. On the second page of the medical report, block 76 contains a physical profile report which is divided into six categories (P, U, L, H, E, S). R. at 12. The "P" stands for "physical capacity or stamina"; the "U" stands for "upper extremities"; the "L" stands for "lower extremities"; the "H" stands for "hearing and ear"; the "E" stands for "eyes"; and the "S" stands for "psychiatric." Para. 9–3(b)(1)–(6), Army Regulation (AR) 40–501, Change 35 (Feb. 9, 1987). *See also Odiorne v. Principi*, 3 Vet.App. 456, 457 (1992); *Hanson v. Derwinski*, 1 Vet. App. 512, 514 (1991). "L" or "lower extremities" includes "the feet, legs, pelvic girdle, lower back musculature, and the lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency." Para. 9–3(b)(3), AR 40–501, Change 35. The veteran's preinduction report shows a number "1" in each of the six categories except for category "L" where a number "4" appears. R. at 12. "An individual having a numerical designation of '1' under all factors is considered to possess a high level of medical fitness and, consequently, is medically fit for any military assignment." Para. 9–3(c)(1), AR 40–501, Change 35. "A profile serial containing one or more numerical designators '4' indicates that the individual has one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited." Para. 9–3(c)(4), AR 40–501, Change 35. In addition, Army medical standards for induction listed knee surgery within one year prior to examination as cause for medical rejection. R. at 105. Therefore, the veteran was temporarily rejected from service "for complete recovery of knee surgery." R. at 9, 12, 15, 18, 105. He was scheduled for reexamination in August 1955. R. at 12.

The veteran underwent reexamination for induction into the Army in September 1955. R. at 10–11, 15, 18, 105. This time under category "L" on the physical profile, the veteran was assigned the number "2,"

which "indicates that an individual possesses some medical condition or physical defect which may impose some limitations on classification and assignment." R. at 10; Para 9–3(c)(2), AR 40–501, Change 35. The examination report also shows that the veteran had had "no further trouble" since having surgery on his knee, and he was therefore found medically fit for induction into the United States Army. R. at 10–11, 15, 18, 105. The report also reflects that, pursuant to Army regulatory guidance to AFES, which "required that all examinees who had been previously discharged from any service for medical reasons and who were later found acceptable on preinduction examination would have their examination forwarded to the Department of the Army for final determination of acceptability," the veteran's examination report was reviewed by the Office of the Surgeon General on December 2, 1955. R. at 11, 105. Pursuant to that review, a waiver was granted which set aside the administrative bar prohibiting induction of those previously discharged from any service. *Id.* As a result of this waiver, the veteran was inducted into the Army on January 12, 1956. R. at 105–06. On the day of induction, a "physical inspection" was done; this inspection consisted of a review of the medical history of the veteran since his examination and "a quick visual examination of the [veteran] to assure that no change in his general physical status ha[d] occurred." R. at 11, 105–06.

On January 19, 1956, a request was made that the veteran be sent to the orthopedic clinic. R. at 15, 18, 108. On January 20, 1956, the examining physician in the orthopedic clinic noted, inter alia,

[The veteran] states that he has right knee pain of two days duration. For the past two days numbness and aching have been present over the anteromedial aspect of the right knee. Past history reveals that in 1954 an arthrotomy was done for removal of loose bodies in the knee joint. At that time patient was told that the cartilages in the right knee were normal. Since the operation in 1954 until the present time the patient has been

asymptomatic. However, since marching, pain has been noted. There has been no swelling.

Physical examination is essentially negative except for the arthrotomy.

Recommendations: X-rays will be taken and further evaluation done next Monday.

R. at 108. Arthrotomy is a "surgical incision of a joint." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 147 (24th ed. 1965) [hereinafter "DORLAND'S"].

On January 25, 1956, the veteran was examined again in the orthopedic clinic, and the examining physician noted, inter alia,

This patient returns to the Clinic at this time and still complains of pain in the knee and also in the quadriceps muscle group.

Physical examination today reveals no abnormality whatsoever. This man's X-rays reveal a minimal hypertrophic lipping and there is a question of a loose body with the knee joint. However, he gives no symptoms compatible with a loose body.

I think a diagnosis of an osteochondritis, or perhaps a chondromalacia of the patella should be entertained in this case. It is my feeling, however, that the complaints are definitely out of line with the physical findings.

R. at 110. Hypertrophy is "the enlargement of an organ or part due to the increase in size of the cells composing it; the overgrowth meets a demand for increased functional activity." MELLONI'S at 212. Lipping is "the formation of a liplike border at the articular end of a bone in degenerative bone disease." *Id.* at 250. Osteochondritis is "inflammation of both bone and cartilage." DORLAND'S at 1068. Chondromalacia is "abnormal softening of cartilage." *Id.* at 98.

Two documents in the record, a rating decision sheet dated September 23, 1963, and an Army Memorandum dated October 13, 1981, show that on February 4, 1956, the veteran requested that he be discharged from the Army. R. at 15, 106. However, no written request from the veteran is in the record. On February 6, 1956,

the veteran underwent a separation examination and was diagnosed with "arthritis, traumatic, right knee joint" and "osteochondritis, dessicans [sic], right knee joint." R. at 13–14. Osteochondritis dissecans is "osteochondritis resulting in the splitting of pieces of cartilage into the joint, particularly the knee joint or the shoulder joint." DORLAND'S at 1068. The separation examination showed the disorders of the knee as having existed prior to service. R. at 14. On February 13, 1956, a disposition board composed of three medical officers met to consider the veteran's case, and subsequent to the board's approval of the diagnoses reflected on the separation examination and its recommendation that the veteran be separated from military service, the veteran was granted a discharge from the Army. R. at 101–02, 106.

In 1963, the veteran reopened his claim for service connection for a knee disability, claiming aggravation of his knee condition during his second period of service. R. at 15. The RO rating board denied his claim, stating that "evidence does not show any substantial findings in the second period of service to warrant conclusion of increased level of disability. The discharge was preventative of aggravation following his written request." R. at 15. The veteran appealed this decision to the BVA, and in April 1964, the Board denied his claim on the grounds that his "preservice right knee disability was not aggravated by active service." R. at 25. In 1965, the Board reconsidered the veteran's claim and concluded that "[t]here was no obvious error in [its] prior determination denying service connection for impairment of the right knee...." R. at 28.

In 1990, the veteran sought to reopen his claim for service connection for a right-knee disability by submitting additional evidence. R. at 83–118. On September 12, 1990, an RO rating board declined to reopen his claim on the grounds that the additional evidence submitted did not constitute new and material evidence. R. at 119. Subsequently, the veteran filed a Notice of Disagreement dated October 19, 1990. R. at 120–21. A Statement of the

Case dated January 22, 1991, was sent to the veteran (R. at 122–26), and the veteran perfected his appeal to the BVA by filing a VA Form 1–9 dated February 8, 1991. R. at 127–28. A hearing was held before the Board in Washington, D.C., on July 26, 1991, at which the veteran's attorney appeared on his behalf. R. at 130–47. (The veteran was unable to attend. R. at 132.) The BVA denied the veteran's claim on November 1, 1991, affirming the RO rating board's determination that the evidence submitted in 1990 did not constitute new and material evidence warranting a reopening of the veteran's claim. *Richard L. McIntosh*, BVA 91–35702 (Nov. 1, 1991). The veteran filed a timely appeal with this Court.

## ANALYSIS

"Except as provided in section 5108 [formerly section 3008] of this title, when a claim is disallowed by the Board, the claim may not thereafter be reopened and allowed and a claim based upon the same factual basis may not be considered." 38 U.S.C.A. § 7104(b) (West 1991). Section 5108 provides: "If new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim." Thus, only if the evidence submitted by appellant is found to be both "new" and "material" may the claim be reopened and the entire record reviewed. *See Manio v. Derwinski*, 1 Vet.App. 140 (1991); *Jones v. Derwinski*, 1 Vet.App. 210 (1991). In *Colvin v. Derwinski*, 1 Vet.App. 171 (1991), the Court stated that "[n]ew evidence is not that which is merely cumulative of other evidence on the record. Material evidence is relevant and probative of the issue at hand.". *Id.* at 174 (citations omitted). The Court held that "to justify a reopening on the basis of new and material evidence, there must be a reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome." *Id.* The determination as to whether evidence is "new and material" is a conclusion of law which this Court reviews de novo under 38

U.S.C.A. § 7261(a)(1) and (a)(3)(A) (West 1991). *Colvin*, 1 Vet.App. at 174; *see also Masors v. Derwinski*, 2 Vet.App. 181, 185 (1992) (whether evidence is "new and material" is reviewed de novo under § 7261(a)(1)); *Manio*, 1 Vet.App. at 146; *Smith v. Derwinski*, 1 Vet.App. 178, 180 (1991) (if BVA determination that evidence was not "new and material" was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a remand is required under § 7261(a)(3)(A)).

Among the evidence submitted by the veteran in order to reopen his claim in 1990, were eleven items labeled as Exhibits A through L (although there was no item designated as G); these items consist of the following: (A) preinduction report of medical examination of January 20, 1955; (B) preinduction report of medical examination of September 12, 1955; (C), (D), and (E) Army Regulation 40–115, paras. 44(n), 44(s), and 43(a)(13), respectively; (F) and (H) a record of disposition board proceedings, dated February 13, 1956, and an Army Surgeon General's memorandum, dated October 13, 1981, respectively; (I) and (J) orthopedic clinic records dated January 20, and January 25, 1956, respectively; (K) vocational rehabilitation documents; and (L) statements by Robert E. Watts. R. at 87–118. In addition to these eleven lettered items, other evidence submitted since the previous Board decisions in 1964 and 1965 includes statements from the veteran (R. at 29–33, 39–41, 44) and private and VA examination and treatment information dated between the 1960s and the 1980s. R. at 34–38, 42–43, 48–80, 149–52.

The Board held that items A, B, I, J, and K were not "new" because these items had been before the Board when it rendered its decisions in 1964 and 1965. *McIntosh*, BVA 91–35702, at 5. Because there is evidence in the record that these items were before the BVA in 1964 and 1965, the Court holds that the BVA's determination that these items did not constitute new evidence was correct. R. at 23–24, 26–27.

In addition, the Board held that items C, D, E, F, H, and L, while new, were

not "material." With regard to items C, D and E, the Board explained that the Army regulations were "not relevant to the issue before the Board, that is, whether the veteran's preexisting right knee disability was aggravated during his period of service in 1956." *McIntosh*, BVA 91–35702, at 5–6. The Board further observed that "[w]hether the veteran was inducted in violation of Army regulations, as he asserts, has no bearing on whether or not the knee disability actually increased in severity during service." *Id.* at 6. In this regard, the Court observes that a substantial portion of appellant's brief is devoted to showing that the veteran was inducted into the Army in violation of Army regulations. Appellant's Br. at 4, 6–10. However, even if we assume, without deciding, that that point is true, the Court notes that appellant's brief is vague with regard to the connection, if any, between that point and the issue of aggravation of the veteran's knee disability in service. (Given that veterans are entitled under the law to a presumption of sound condition upon induction (38 U.S.C.A. § 1111 (West 1991)), the argument that the condition of the veteran's knee was of such severity that he should not have been inducted into military service in the first place, i.e., that he was not in sound condition, may weaken, rather than support, the proposition that the condition of the knee worsened or was aggravated *after* induction to an extent warranting discharge.) Nevertheless, appellant states that the evidence regarding the veteran's induction into military service "is not offered in support of a violation of Army regulation[s], although such violation did exist, but is offered as evidence of the [veteran's] medical condition before, during, and after basic military training." Appellant's Br. at 4. Moreover, appellant states,

> Since the [veteran] was determined to have a preexisting medical condition, and the only intervening circumstances between the induction into military service and his subsequent medical discharge were those related to and involving the rigors of basic military training, the undisputed conclusion is that the physical requirements of basic training aggravated the preexisting medical condition to such an extent as to warrant medical discharge.

*Id.* Here, appellant disputes the previous final decisions of the Board that the veteran's knee disorder was not aggravated in service by asserting that aggravation in service indisputably occurred. This assertion also was made by the veteran's attorney at the July 1991 hearing before the BVA. R. at 144. Such an assertion, in itself, does not constitute new and material evidence warranting reopening of the claim, and appellant does not show in his brief, nor is it clear from the record, how the Army regulations support this assertion. Such an assertion is not material because as a lay opinion it is not cognizable. *Espiritu v. Derwinski*, 2 Vet.App. 492, 494 (1992). Because the Army regulations are not relevant and probative of the veteran's medical condition during service, the Court holds that the BVA determination that this evidence was not material was correct.

■ Item H of the additional evidence submitted by the veteran is dated October 13, 1981. R. at 105–06. The BVA referred to this item as "a memorandum ... from the Department of the Army Surgeon General." *McIntosh*, BVA 91–35702, at 5. This memorandum was apparently written in response to an application by the veteran in 1981 for "medical disability retirement" from the Army "based upon aggravation of a condition which existed prior to entry into the service." R. at 105. To support its conclusion that this evidence was not "material," the BVA provided the following reasons or bases:

> ... the Surgeon General's statement is not relevant to the issue of whether the preservice disability increased in severity. This statement serves only to explain regulatory procedures for inducting individuals with preexisting disorders. Additionally, it recaps information contained in the service medical records. It does not provide any proof that the veteran's underlying conditions of the right knee, arthritis and osteochondritis disse-

cans, worsened during his short period of service in 1956.

*McIntosh,* BVA 91–35702, at 6. The Court agrees that much of the memorandum is devoted to the explanation of induction procedures and that some of it reiterates information from the service medical records. However, the Court notes that, with regard to the issue of aggravation, the memorandum provides in pertinent part:

On [January 19, 1956, the veteran] sought health care for apparent *occurrence of symptoms* in the right knee. Physical examination of the knee on [January 20 and 25, 1956,] in an orthopedic clinic revealed no abnormalities. X-rays showed changes consistent with his prior surgery. He had continued complaints of pain in the knee to the point that completion of the physical training requirements appeared impossible. Based upon his inability to complete the required training his usefulness as a soldier was extremely limited and early discharge was advisable. He requested discharge [on February 4, 1956].

A [d]isposition [b]oard ... recorded the diagnosis and recorded the existence of the diseases prior to entry on active duty. For military disposition processing purposes *a determination was made that the diseases had not been permanently worsened by the period of military service, i.e., not permanently aggravated by active duty. This determination was based upon good medical knowledge of the natural course of the disease process* specifically in that the x-ray changes seen in the applicant's knees require a lengthy period, measurable in years, to develop to the severity shown and therefore could not have developed in response to his short period of active duty *The symptoms which occurred were a result of previous joint disease in response to vigorous military training physical activities.*

R. at 106 (emphasis added). The record of the disposition board's proceedings summarized in the Surgeon General's memorandum constitutes item F of the additional evidence submitted by appellant to reopen his claim. R. at 101–02.

Section 3.306 of the regulations pertains to aggravation of preservice disabilities and provides in pertinent part as follows:

(a) *General.* A preexisting injury or disease will be considered to have been aggravated by active military, naval, or air service, where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease.

. . . .

(c) *Peacetime service.* The specific finding requirement that an increase in disability is due to the natural progress of the condition will be met when the available evidence of a nature generally acceptable as competent shows that the increase in severity of a disease or injury or acceleration in progress was that normally to be expected by reason of the inherent character of the condition, aside from any extraneous or contributory cause or influence peculiar to military service. Consideration will be given to the circumstances, conditions, and hardships of service.

38 C.F.R. § 3.306 (1992); *see also* 38 U.S.C.A. § 1153 (West 1991).

The Court observes that the evidence presented does not support appellant's claim for aggravation but rather shows that the Army determined that, although the veteran may have experienced pain and other symptoms in his knee immediately following military training activities, the condition of his knee was not worsened by these activities. The three medical officers of the Army disposition board examined the medical evidence and determined that any changes or abnormalities in the condition of the veteran's knee were a result of "the natural course of the disease process" and not the result of seven days of military training activities. Because the Surgeon General's memorandum and the disposition board proceedings oppose rather than support the appellant's claim that his knee condition was aggravated in service, such evidence is not probative of his claim and therefore does not constitute new and material evidence. Accordingly the Court af-

firms the BVA's determination in this regard.

■ Item L of the additional evidence submitted by appellant consists of two statements of Robert E. Watts, who stated that "on or about January 12, 1956, [he] was inducted (drafted) into the Army at the same time and with Richard L. McIntosh." R. at 117. Mr. Watts further stated that a few days after induction, he and the veteran "were separated into different companies" and that he did not see the veteran for "approximately three or four weeks" at which time he saw the veteran "at the base hospital." *Id.* Mr. Watts also stated that the veteran's "right knee was swollen so much that the pant leg of his fatigues (uniform) was pulled tight around his leg" and "[h]e was limping very awkwardly. At that time he told me they were going to x-ray his knee and see what was causing the swelling and pain." *Id.*

With regard to this statement, appellant asserts, "The sworn testimony of Mr. Watts is in direct contravention to the conclusion drawn by the Surgeon General's report and directly refutes the Board's determination [in 1965] that there were only the [veteran's] subjective symptoms in evidence." Appellant's Br. at 11–12. The Board concluded that, while "new," this evidence was not "material" because the statements "pertain only to a flareup of symptomatology during service and offer no information relative to the underlying disorders." *McIntosh*, BVA 91–35702, at 6. The Court affirms the Board's determination that this evidence was not "material."

■ The Court holds, as a matter of law, that the other evidence of record submitted to the VA since the previous Board determinations in this case, including statements from the veteran and private and VA examination and treatment information did not constitute new and material evidence warranting a reopening of the veteran's claim. Specifically, the statements of the veteran (R. at 29–33, 39–41, 44, 118), although defining the issue in this case precisely, i.e., "whether the symptoms manifested during service demonstrate an in-crease in severity of the preexisting knee disorder so as to establish aggravation" (R. at 29), do not provide competent medical evidence that such aggravation of the disorder occurred. *Espiritu*, 2 Vet.App. 492. Therefore, the statements are not material. With regard to the private and VA examination and treatment information dated between the 1960s and the 1980s, much of it does not pertain to the veteran's knee but rather to other ailments and is therefore not material. R. at 34–38, 42–43, 48–80, 152. Where these records do pertain to the right knee (R. at 34, 36–38, 48, 52–53, 58, 64, 76–78, 149–151), they do not provide evidence that any current problems with the right knee may be attributed to aggravation in service, and therefore they are not material.

Finally, the Court observes that in his VA Form 1–9, substantive appeal to the Board of Veterans' Appeals, the veteran stated among his reasons for appeal:

Presence of clear and unmistakable error in denials for service connected disability based upon previously submitted and re-submitted factual data.

R. at 127–28. The Court also observes that the BVA did not address the issue of clear and unmistakable error in prior decisions in this case.

■ This Court has held that the BVA "must review all issues which are reasonably raised from a liberal reading of the appellant's substantive appeal." *Mingo v. Derwinski*, 2 Vet.App. 51, 54 (1992) (citing to *Myers v. Derwinski*, 1 Vet.App. 127, 129 (1991)). In addition, with regard to claims for clear and unmistakable error in previous adjudications of a claim, the Court noted the following in *Russell v. Principi*, 3 Vet.App. 310, 313 (1992):

In order for there to be a valid claim of "clear and unmistakable error," there must have been an error in the prior adjudications of the claim. Either the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied. The claimant, in short, must assert more

than a disagreement as to how the facts were weighed or evaluated.

In this case, the claim of clear and unmistakable error as expressed in the VA Form 1–9 is too vague for the Court to hold that there was expressed here "more than a disagreement as to how the facts were weighed or evaluated." Therefore, the Court holds that a claim of clear and unmistakable error was not "reasonably raised," even given a "liberal reading" of the substantive appeal. *Mingo,* 2 Vet.App. at 54. The Court further holds that, in order to warrant review by the Board, a claim of clear and unmistakable error must be raised with specificity regarding when and how clear and unmistakable error occurred. Accordingly, the Court holds that the BVA did not err in not addressing the claim of clear and unmistakable error made here.

## CONCLUSION

For the reasons stated above, the November 1, 1991, decision of the BVA is AFFIRMED.